Filed 9/2/20  In re T.C. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re T.C., A Person Coming Under the Juvenile Court Law. | B304118 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. DK05855A |
| Plaintiff and Respondent, | |
| v. | |
| C.C. et al., | |
| Defendants and Appellants. | |

APPEALS from an order of the Superior Court of Los Angeles County.  Steven E. Ipson, Judge Pro Tempore of the Juvenile Court.  Affirmed.

Melissa A. Chaitin, under appointment by the Court of Appeal, for Defendant and Appellant Mother C.C.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant Father T.L.C.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

Mother and father separately appeal from the juvenile court's order terminating parental rights to their son T.C. under section 366.26 of the Welfare and Institutions Code.[1] Parents argue the juvenile court erred when it denied them a contested hearing on the beneficial parent-child relationship exception to termination of parental rights. Finding no error, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

T.C., born April 2003, has special health care needs. He has Down syndrome, type 1 diabetes, a congenital heart defect, asthma, hypothyroidism, and sleep apnea. Parents have five children, including T.C., who is the oldest.[2] At the time of the dependency, T.C., his sister, and one of his brothers lived with mother, and T.C.'s two other brothers lived with father in Oklahoma. Father traveled with the children to California to visit.

### 1. *The dependency petition*

The family came to the attention of the Los Angeles County Department of Children and Family Services (the Department) in July 2014 when mother brought then-11-year-old T.C. to the

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Mother was a dependent of the juvenile court at the time of T.C.'s birth.

hospital suffering from abdominal pain and difficulty breathing. He was malnourished and weighed only 48 pounds. T.C. was diagnosed with acute Diabetic Keto Acidosis condition and acute respiratory distress syndrome. He went into cardiac arrest and had to be put on a ventilator. Mother said she was unaware T.C. had diabetes. Based on his condition, however, T.C.'s doctor opined T.C. either had not received regular medical care or mother had not followed through with medical recommendations.

The Department removed the children from mother's care. It placed T.C.'s siblings with father, who had traveled from Oklahoma, at paternal great-grandmother's house. Because he had to return to Oklahoma for T.C.'s brothers, father reluctantly agreed the Department could place T.C. in a medical foster home when he was discharged. On August 7, 2014, the Department filed a section 300 petition on behalf of T.C. and his two siblings who had been in mother's care,[3] alleging they were at substantial risk of harm due to mother's serious medical neglect of T.C., her inappropriate discipline of the children, and a 2012 suicide attempt. At the detention hearing, the juvenile court detained T.C. from both parents. The two siblings remained suitably placed with father. Father was identified as "non-offending" and able to have unmonitored visits with T.C. Mother's visits were to be monitored.

On September 30, 2014, the juvenile court declared T.C., his sister, and brother dependents of the court.[4] The court

---

[3]     T.C.'s siblings are not the subject of this appeal.

[4]     On March 30, 2016, the court awarded joint custody of T.C.'s sister and brother to parents and terminated its jurisdiction over them.

removed T.C. from parents' custody.  T.C.'s former elementary school teacher Ms. A. had asked that she be considered for T.C.'s medical foster placement.  He was placed with her on September 18, 2014.  The court ordered mother and father each to participate in parenting classes for special needs children and individual counseling.  Mother also was ordered to participate in mental health services and to complete a domestic violence program.

The court subsequently ordered mother and father to complete juvenile diabetes education at the hospital.  Mother verified she completed the diabetes training class in December 2014.  Father said he had been trained.

## 2.    *Six-month review period*

The six-month review hearing set for March 30, 2015, was continued several times until December 21, 2015.  By March 2015, T.C.'s health was stable, and he had gained weight.  Ms. A. was providing him with the care he needed and was "on top of" his diabetes.  T.C. appeared happy and at ease in her home.

In September 2015, the Department reported that T.C. continued to do well in Ms. A.'s home and had a secure attachment with her.  His diabetes had stabilized, he was participating in extracurricular activities, and he had made progress in school, both socially and academically.

During this review period, parents were in partial compliance with their case plans.  Father had enrolled in parenting classes, but as of March 2015 had not completed them yet.  Mother had enrolled in her court-ordered services but also had yet to complete them at that time.

Father's visits with T.C. were sporadic.  The Department's May 2015 report noted father had only one visit with T.C.—

in mid-May—in the prior three months.  He also did not call to ask about T.C.  In September 2015, the Department reported father only had two visits with T.C. in June, one visit in July, and no visits in August.

Father also did not seem to understand his son's needs. After one visit with father, T.C. returned with "extremely high" blood sugar levels; father had not monitored T.C.'s blood sugar even though he supposedly had been trained to do so.  The Department did not believe father was able to care for T.C. at that time.

The Department described mother's visits with T.C. as inconsistent.  Mother earlier had told the Department she could not afford transportation to go to T.C.'s doctor's visits, because she "only worked once in a while."  She told Ms. A. the opposite—that she had to cancel visits due to her busy work schedule.[5]  She also was not very responsive to the social worker's calls and texts to confirm her address.[6]

Between March and September 2015, mother had two visits with T.C. in March, no visits in April, three visits in May, four visits in June, and two visits in July, as well as in August.  The social worker observed a visit at T.C.'s school:  T.C. always went to Ms. A. or other teachers to talk and play, not mother.

Although Ms. A. informed mother about T.C.'s doctor's appointments, mother had attended only one of them.  Father had not been to any of T.C.'s medical appointments.  Throughout

---

[5]     Mother also told Ms. A. that she had no money for transportation even though the Department had given her a bus pass.

[6]     Mother was homeless for a period.

the review period, father remained untrained on T.C.'s medical condition; he did not seem to know how to react if T.C.'s sugar levels dropped.

T.C. stated he liked when mother visited, but liked living with Ms. A. T.C. became anxious when he visited father and sought assurance from Ms. A. that she would return for him.

The Department's status review report for the final December 21, 2015 six-month review hearing noted mother continued to be in partial compliance with her case plan. She still refused to provide the Department with her address. Mother had two-hour, weekly visits with T.C., monitored by Ms. A., that usually took place at a coffee house. Mother and T.C. interacted well with each other during these visits, but mother seemed to want to spend more time conversing with Ms. A. T.C. also would ask to go " 'home' " after an hour. Ms. A. said she redirected mother to interact with T.C. and encouraged T.C. to visit with mother, but did not force T.C. to stay an additional hour if he insisted on leaving. In September 2015, mother visited T.C. twice—additional, scheduled visits were canceled due to illness or other reasons. In October, she had three visits with two visits having been canceled. She also had two visits with T.C. in November.

The Department also was having trouble reaching father. Father's visits with T.C. were unmonitored for two hours per week. T.C. usually would see his siblings when he visited father. Father scheduled only one visit with T.C. in September, one visit in October, and one visit in November. He canceled his two scheduled visits in December. The Department expressed concern that father was not properly trained on T.C.'s medical condition and was unable to manage T.C.'s diabetes without

Ms. A.'s help.  In its last minute information report, the Department informed the court it would be asking the court under section 388 to change father's visitation from unmonitored to monitored until he completed medical training to be able to meet T.C.'s diabetic needs.

The Department described parents' progress as "minimal" since the last hearing.  It recommended terminating mother's reunification services, but continuing them for father.

T.C. was observed to be very attached to Ms. A.  When asked about his feelings toward parents, T.C. responded that he sees them during visits.  T.C. changed the subject when the social worker asked him about details.  He said he liked living with Ms. A.  The Department reported Ms. A. was interested in becoming T.C.'s legal guardian or adopting him.

On December 21, 2015, the court reverted father's unmonitored visits with T.C. to monitored for a minimum of two hours per visit, twice per week.  The visits automatically would return to unmonitored once father completed a diabetes training program.  The court continued parents' family reunification services.

3.    *Legal guardianship*

In February 2016, T.C. had an insulin pump installed, and father completed training on its use.  Father said he signed up for the basic diabetic training, but did not have an appointment yet.

Parents started having monitored visits with T.C. from 4:00 to 6:00 p.m. on Wednesdays at a McDonald's.  Parents usually stayed for only an hour, however.  Father brought T.C.'s siblings to the visits.  Foster mother noted that when the siblings did not come, T.C. lost interest quickly.  Parents did not contact T.C. by phone.

From the last hearing until the Department completed its supplemental report filed February 24, 2016, mother attended a visit at the end of December 2015, three visits in January 2016, and two visits in February 2016. Father missed the visit in December, attended two visits in January, and visited with T.C. during the insulin pump training in February. Foster mother noted that T.C. asked to go back to her home during most of the January visits and sometimes did not want to go to the visit at all.

By the time the Department filed its April 22, 2016 report, mother had obtained housing and was living there with T.C.'s siblings. She said she had been visiting with T.C. weekly. Father also said he visited T.C. weekly with mother and the other children.

By this time, parents had completed most court-ordered services. Since September 2014, mother had attended three doctor's appointments (two in the last two months),[7] and father had not attended any. Parents also appeared to have little understanding of T.C.'s complicated medical needs. It was unclear to the Department they would be able to care for T.C.

In its July 6, 2016, status review report, the Department noted mother had been visiting T.C. consistently. T.C.'s siblings accompanied her on visits. Ms. A. encouraged as much visitation as possible between T.C. and mother and his siblings. She wanted T.C. to maintain "a strong and positive relationship with his family." Ms. A. and mother had a good relationship.

---

[7]     Mother's work schedule apparently had prevented her from participating in more appointments.

8

Father's visits, on the other hand, were inconsistent. He often canceled at the last minute. He also had not passed the medical training for T.C.'s diabetic care.

In June 2016, mother decided she would like Ms. A. to become T.C.'s legal guardian. Ms. A. was willing to become T.C.'s legal guardian—she cared for T.C. and wanted to ensure he had proper medical care. Father did not agree with legal guardianship; he wanted to continue family reunification services.

Before the July 11, 2016 review hearing, the Department informed the court that the hospital could not schedule mother's insulin pump training until late July 2016. Father needed to take the basic diabetes training and then re-take the pump training. The hospital could not schedule father's training until mid-September 2016. He completed it on September 14, 2016.

At the hearing, the Department asked the court to terminate reunification services and set a section 366.26 hearing to consider legal guardianship as T.C.'s permanent plan. Mother submitted on the legal guardianship. The court found parents were in partial compliance with their case plans, and T.C. was not likely to be returned to their care in the next six months. It terminated reunification services.

In its section 366.26 report filed November 8, 2016, the Department noted mother continued to visit T.C. at least once a week, called him often, and was involved in his life. Mother and Ms. A. got along well and spent time together as a family to make sibling visitation easier. T.C.'s siblings sometimes spent the night at Ms. A.'s home. In contrast, father had not visited T.C. in over three months, nor did he call T.C. The report stated, "Father's visitation with [T.C.] has always been inconsistent."

9

T.C. at first was upset by father's lack of contact, but it no longer seemed to bother him. The Department recommended legal guardianship as "the most appropriate plan at this time."

On November 8, 2016, the juvenile court appointed Ms. A. as T.C.'s legal guardian. Jurisdiction was not terminated, however, due to T.C.'s medical condition.

**4.** ***Post-permanent plan review***

For the next two and a half years or so, the juvenile court continued to find legal guardianship appropriate.

By May 2017, mother was medically trained and able to visit with T.C. in her own home. Mother visited at Ms. A.'s home, and T.C.'s siblings continued to have overnight visits there. The families also got together for holidays. Father had not been visiting or calling T.C. T.C. was happy in Ms. A.'s home and loved her.

A year later, however, the Department reported in May 2018 that mother's visits with T.C. were inconsistent again. He saw his siblings every two to three weeks, however, including overnight visits. Father did not have regular contact with T.C., but he did call on T.C.'s birthday. Ms. A. and T.C. were observed to share a close bond.

In its late November 2018 report, the Department noted that mother was engaging in "occasional contact but nothing consistent." T.C. had regular contact with his siblings, though, who often spent the night at his house. Nevertheless, Ms. A. continued to maintain open communication with mother. Father did not contact T.C. at all during that review period; he reportedly had returned to Oklahoma.

Mother continued to have occasional but inconsistent contact with T.C. during the next six-month review period.

During this review period—reported in May 2019—mother married her long-time boyfriend without first telling T.C. He was upset. Due to concerns about mother's husband, Ms. A. no longer allowed T.C. to visit at mother's home if the husband was there. T.C.'s siblings continued to visit him at Ms. A.'s house and also had phone contact with him. Father again had no contact with T.C. during this review period.

At the June 2019 review hearing, T.C.'s counsel asked the court to set a section 366.26 hearing to consider adoption as the permanent plan. By this time, T.C. was 16 years old. He likely would need a conservatorship when he reached age 18. The court ordered the Department to consider whether the permanent plan should be adoption rather than legal guardianship.

5.    *Section 366.26 proceedings*

The Department filed its section 366.26 report on September 27, 2019. Father's whereabouts had been unknown until late September 2019 when the Department learned father was living in Reno, Nevada. The Department reported there had been no contact between T.C. and father "during the past few years." It considered father's visits "non-existent."

Ms. A. was willing to adopt T.C. She thought of T.C. as her son and wanted to provide him with consistency and stability. Ms. A. was open to T.C. continuing to have family visits if they did not include mother's husband. The Department recommended adoption by Ms. A.

During the next months, mother continued to have "occasional contact" with T.C. Father resumed contact with T.C. when the section 366.26 proceedings resumed in October 2019, after having had no contact with T.C. for more than a year.

11

Before the October 2019 section 366.26 hearing, mother had occasional phone contact with T.C. but inconsistent in-person visits. At that hearing, the court modified the visitation order to visits monitored by Ms. A. at a neutral Department-approved location. Mother and Ms. A. agreed to weekly visits. Mother visited with T.C. five times between the October 2, 2019 hearing and the Department's completion of its status report on November 7, 2019. T.C. reportedly was "not keen to weekly visits."

The court also had ordered a phone schedule for father because he lived out of state. Ms. A. said father was permitted to call T.C. on T.C.'s own cell phone whenever father wanted to contact him. Father called T.C. for about a week after the October section 366.26 hearing, but then stopped. T.C. maintained regular, consistent contact with his siblings, however.

In January 2020, Ms. A. was deemed "Adoption Ready." She was confident she could properly care for T.C. and provide him with a "safe, warm, nurturing and stable life." The Department noted T.C. could not provide a meaningful statement, but when asked where he wanted to live, T.C. "quickly replied, 'I want to stay here forever with [Ms. A.].' "

Mother and father both were present for the January 30, 2020 section 366.26 hearing. T.C. and Ms. A. also were present. Father's and mother's counsel each objected to the termination of parental rights. Father's counsel asked for a contested hearing. As an offer of proof, she asserted father had maintained phone contact with T.C. and believed T.C. "would benefit [from] an ongoing relationship" with him.

Mother's counsel asked for a contested hearing under section 366.26, subdivision (c)(1)(B)(i), the beneficial parent-child

relationship.[8] He argued mother had maintained frequent, regular, and consistent visits with T.C. For mother's offer of proof, her counsel asserted mother had been visiting T.C. weekly contrary to what the Department had reported. Counsel continued: "They have in depth conversation about their personal lives, about anything new, about the minor's schooling, the sports he's into." Counsel represented mother also communicated with T.C. frequently through text and video chat, and had two notebooks containing notes detailing their visits with her in court. He offered that "[a]s far as she's been allowed to, [mother] is still trying to act as a parent to this minor, and the relationship seems to be going very well."

Mother's counsel also reminded the court that mother had waived reunification services in 2016 to allow legal guardianship because T.C. wanted to stay with Ms. A., stating, "Mother put aside her own personal feelings in order to do what her son want[ed], and that's the reason why she hasn't followed the 388 to this point because [T.C.] is requesting to remain in his placement. But the mother does still want to continue a relationship with this child, and she's been making every effort possible to stay in contact with this child."

T.C.'s counsel argued mother's offer of proof did not state a prima facie case for an exception to adoption. He argued there was no indication of a "particularly strong parental bond." Mother's counsel responded that mother was permitted to visit

---

[8] The reporter's transcript shows counsel asked the court to "set the matter for a contested hearing pursuant to 366.26(C)(B)(1)." We can infer counsel meant section 366.26(c)(1)(B)(i).

T.C. only once a week and would visit more if she could. He also asserted mother was fostering a relationship between T.C. and his siblings in mother's custody. The Department's counsel submitted the issue to the court.

The court acknowledged father's phone visits, and mother's "more extensive in-person visits" and desire to maintain a relationship with T.C. It found counsel failed to articulate a prima facie case that terminating parental rights would be detrimental to T.C. and denied parents' request for a contested hearing. Finding no exception to adoption, the court terminated parental rights.

## DISCUSSION

Mother and father separately contend the juvenile court erred when it denied their requests for a contested hearing on the applicability of the beneficial parent-child relationship exception to adoption. We review the juvenile court's denial of a contested hearing for abuse of discretion. (*In re Grace P.* (2017) 8 Cal.App.5th 605, 611 (*Grace P.*).)

### 1.    *The right to present evidence at a section 366.26 hearing*

" 'The selection and implementation hearing under section 366.26 takes place after the juvenile court finds that the parents are unfit and the child cannot be returned to them.' " (*Grace P., supra*, 8 Cal.App.5th at p. 611.) If, as here, the parents have failed to reunify with their child and the juvenile court has found the child likely to be adopted, "the burden shifts to the parents to show exceptional circumstances exist such that termination [of their parental rights] would be detrimental to the child." (*Ibid.*) The beneficial parent-child relationship exception is one such circumstance. For the exception to apply, parents must

14

show they "have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

"A parent has a right to due process at a section 366.26 hearing resulting in the termination of parental rights, which includes a meaningful opportunity to be heard, present evidence, and confront witnesses." (*Grace P., supra*, 8 Cal.App.5th at p. 612.) Parents may thus request a contested hearing to present evidence supporting their contention that an exception to the termination of parental rights applies. (*Id.* at p. 611.) Nevertheless, " 'due process does not require a court to hold a contested hearing if it is not convinced the parent will present relevant evidence on the issue he or she seeks to contest.' [Citation.] 'The trial court can therefore exercise its power to request an offer of proof to clearly identify the contested issue(s) so it can determine whether a parent's representation is sufficient to warrant a hearing involving presentation of evidence and confrontation and cross-examination of witnesses.' [Citation.] The parent's offer of proof 'must be specific, setting forth the actual evidence to be produced, not merely the facts or issues to be addressed and argued.' " (*Id.* at p. 612; see also *In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1121 [due process does not require a contested hearing if the parent does not proffer "relevant evidence of significant probative value" to the issue parent seeks to contest].)

2.  ***Parents' offer of proof was insufficient to require the juvenile court to grant them a contested hearing***

A parent seeking to prevent termination of his or her parental rights under the beneficial parent-child relationship exception must satisfy a two-prong test. (*Grace P., supra*,

15

8 Cal.App.5th at p. 612.)  The first prong requires the parent to demonstrate that he or she has maintained regular contact with the child.  (*Ibid.*)  The second prong requires the parent to demonstrate there is a sufficiently strong bond between the parent and child such that the child would suffer detriment from the termination of the parent's rights.  (*Ibid.*)  In other words, the parent-child relationship must " ' "promote[ ] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." ' " (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.)  Thus, "[a] biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466 (*Angel B.*).)

"The second prong requires the court's careful assessment of the child's relationship with the parent.  Because this is an individualized inquiry and parenting styles and relationships differ greatly between families, the juvenile court must take caution before denying a contested hearing on this issue when a parent has clearly maintained regular contact with the child." (*Grace P., supra*, 8 Cal.App.5th at pp. 614-615.)  In *Grace P.*, relied on by parents, this division concluded a juvenile court abuses its discretion if it denies a contested hearing on the beneficial parent-child relationship exception when a parent— who has consistently visited his or her children—offers testimony about "the quality of their parent-child relationship and possible resulting detriment that would be caused by its termination." (*Id.* at pp. 608-609.)  As we will discuss, parents' offer of proof is distinguishable from that offered in *Grace P.*

16

a.    *Mother's offer of proof*

Here, the Department's reports show mother regularly visited T.C. for periods and also had periods of inconsistency. Mother's counsel offered that mother had been visiting T.C. weekly—as much time as the court order allowed—and had regular text and video chat contact with him.  We can presume, without deciding, mother's offer of proof was sufficient to raise a contested issue for the first prong of the exception, regular visitation.  Moreover, the juvenile court did not deny mother a contested hearing based on her inability to demonstrate regular visitation.  It focused on the second prong of the beneficial parent-child relationship exception, finding mother had not articulated a basis to find a compelling reason why terminating parental rights would be detrimental to the child.  We thus consider whether mother's offer of proof was sufficient to raise a contested issue under the second prong of the exception.

Mother's offer of proof included her "in depth conversation[s]" with T.C. during their visits and her two notebooks "detailing the visitation and the contact" she has had with T.C.  The conversations mother proffered demonstrate mother and T.C. interacted positively, and mother showed an interest in T.C.'s life.  To satisfy the beneficial parent-child relationship exception, however, mother had to show "more than frequent and loving contact, an emotional bond with [T.C.], or pleasant visits." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.)  Rather, mother had to offer evidence that showed she "occupies a parental role in [T.C.]'s life" (*ibid.*), creating a "*substantial*, positive emotional attachment" between them such that T.C. would be "*greatly* harmed" if their parent-child

17

relationship were severed.  (*Angel B.*, *supra*, 97 Cal.App.4th at p. 466.)  She did not.

Through her counsel, mother claimed she acted as a parent to T.C. as much as she was allowed.  The record demonstrates the contrary.  The main reason for T.C.'s dependency was mother's medical neglect that almost caused his death.  Yet, mother attended very few of T.C.'s medical appointments, despite being invited to them.  Nor was there any evidence before the court— proposed or admitted—showing mother took an active role in helping T.C. to monitor his diabetes, beyond participating in training, or that she could provide T.C. with day-to-day care. (See *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 ["The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation."].)  Rather, mother's "in depth conversations" with T.C. about his school, what was new, and the sports he liked, are the type a "friendly visitor" or "friendly nonparent relative" might have.  (*Angel B.*, *supra*, 97 Cal.App.4th at p. 468.)  They certainly do not demonstrate T.C. held a particularly strong emotional attachment to mother and, considering his special needs, do not provide evidence mother's relationship with T.C. met his "need for a parent."  (*Id.* at p. 466.)

Moreover, mother did not provide any details about what she would testify to or what the notebooks contained to show she occupied such a role in T.C.'s life.  In contrast, in *Grace P.*, the father, who had weekly monitored visits with his children, proposed to testify about the quality of his visits, how he parented the children during the visits, and how they considered him a parental figure.  (*Grace P., supra*, 8 Cal.App.5th at p. 614.)

18

He asserted he could testify that: he talked to his young children about school, brought them food, played with them, and addressed their behavioral issues; he told the children he loved them, and they returned the sentiment; and the children reserved the name "papa" for him alone and " 'perceive[d] him in a parental role.' " (*Id.* at p. 610.) He also claimed his six-year-old daughter would testify that she enjoyed his visits, saw him as a " 'father figure,' " and " 'would be sad if he were not her father.' " (*Ibid.*) Mother offered no similar evidence to show T.C. perceived her as a mother figure during their visits.

Nor do the Department's reports reflect the existence of a strong emotional attachment between T.C. and mother. T.C. looked to Ms. A. for all of his needs. As far back as May 2015, when mother visited his school, T.C. turned to Ms. A. or other teachers, not to mother. And, as Ms. A. told the Department, T.C. did not always want to stay for the entire length of his scheduled visits with parents. We acknowledge T.C., unlike the child in *Grace P.*, may have been unable to articulate his feelings about mother due to his limited speech. Mother also reportedly was involved in T.C.'s life and interacted well with him during visits. Nothing in the record, however, demonstrates T.C. turned to mother for comfort and guidance, missed her, or seemed sad when their visits ended. Mother did not offer to present evidence to show otherwise.

Finally, even if mother's testimony and notebooks detailing her visits with T.C. were to reveal T.C. was emotionally attached to her and looked to her as a parent, counsel did not so much as suggest mother could present evidence to show the well-being T.C. derived from their relationship outweighed the benefits of permanency and stability he would receive through his adoption

19

by Ms. A.[9] (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 396 [issue is not whether a bond exists between parent and child but "whether that relationship remained so significant and compelling in [the child]'s life that the benefit of preserving it outweighed the stability and benefits of adoption"].)

As we have discussed, Ms. A. provided T.C. with all of his needs and treated him as her son. Under Ms. A.'s care, T.C.'s medical condition stabilized. He was learning to manage his diabetes himself, meeting his academic goals, and becoming more independent. T.C. had been living with Ms. A. for more than five years and looked to her as his parent. T.C. wanted to stay with Ms. A. forever, and she wanted to provide him with permanency and stability.

To be sure, T.C. achieved stability through the earlier plan of legal guardianship. "The Legislature has decreed, however, that guardianship is not in the best interests of children who cannot be returned to their parents. These children can be afforded the best possible opportunity to get on with the task of growing up by placing them in the most permanent and secure alternative that can be afforded them. In decreeing adoption to be the preferred permanent plan, the Legislature recognized that, 'Although guardianship may be a more stable solution than foster care, it is not irrevocable and thus falls short of the secure and

---

[9] Mother's counsel also asserted mother was fostering a relationship between T.C. and his siblings. Ms. A. encouraged that relationship, as well, however. The siblings often had overnight visits with T.C. at Ms. A.'s home, and Ms. A. has said she is open to continuing family visits. Moreover, mother never argued Ms. A.'s adoption of T.C. will cause a "substantial interference" with T.C.'s sibling relationships. (See § 366.26, subd. (c)(1)(B)(v).)

permanent placement intended by the Legislature.' " (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419.) Only through adoption, therefore, could Ms. A. be certain of providing T.C. with the *permanent* home she so wanted to provide him.

No matter how positive mother's visits may have been shown to be through her notes or how much interest mother paid T.C. in conversing with him about his life, we conclude the proffered evidence did not demonstrate T.C.'s bond with mother was so great as to be more important than T.C.'s ability to achieve permanency through adoption by an individual who loved him and was committed to—and capable of—providing for all of his needs.

b.      *Father's offer of proof*

Unlike mother, we cannot presume father's proposed testimony that he had phone contact with T.C. was sufficient to raise an issue as to whether he consistently and regularly visited T.C. We recognize father was "nonoffending" and lived out of state. Nevertheless, the record shows father never had the type of regular visitation with T.C. required for the beneficial parent-child relationship exception to apply. (*In re I.R.* (2014) 226 Cal.App.4th 201, 212 ["[r]egular visitation exists where the parents visit consistently and to the extent permitted by court orders"].)

Before Ms. A. became T.C.'s legal guardian, father had unmonitored visits with T.C. But, father often canceled the visits, and he did not call to check on T.C. Sometime after the legal guardianship was granted, father did not contact T.C. at all for over a year—not even by phone. Moreover, the Department's reports already state that father called T.C. regularly after the October 2019 section 366.26 hearing. The calls stopped after

21

about a week, however, even though Ms. A. told father he could call T.C.'s cell phone anytime.  Thus, because father would be incapable of proving he had regular and consistent contact with T.C., the court did not abuse its discretion in denying him a contested hearing.  (*Grace P., supra*, 8 Cal.App.5th at p. 614.)

Even if father could demonstrate regular contact with T.C., however, father's counsel made no offer of proof of the *evidence* he would introduce to establish the second prong of the exception.  Counsel only said, "We believe that the child would benefit with an ongoing relationship with the father."  That proffer is a far cry from the proposed testimony the father in *Grace P.* offered.  The court did not err in denying father a contested hearing based on it.  (*Grace P., supra*, 8 Cal.App.5th at p. 612 [parent must proffer actual evidence, not merely facts or issues].)

Because parents' offers of proof did not raise a viable issue as to the application of the beneficial parent-child relationship exception, the juvenile court did not abuse its discretion when it denied parents a contested hearing.

## DISPOSITION

We affirm the juvenile court's January 30, 2020 order terminating parental rights.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:


LAVIN, Acting P. J.


DHANIDINA, J.